## RUFUS MADDEN *versus* JOSEPH TUCKER.

Statements of the scrivener of a deed, as to what the parties directed him to do at the time of the drawing a deed, are not admissible to show which of two lots of land were intended to be conveyed by the deed.

The controlling description in a deed being, "the McKay farm, so called," what was the McKay farm at the time the deed was given, is a question properly submitted to the jury.

The first part of a description of land in a deed, answering equally well the hypothesis of either party, as to the boundaries of the land conveyed, the intention of the parties to the deed must be discovered by the concluding part, if that renders the description certain.

The case of *Webster* v. *Emery*, 42 Maine, 204, explained.

MOTION for a new trial, and exceptions to the ruling of MAY, J.

This was a writ of entry. After verdict and before judgment, the defendant, against whom the verdict was rendered, moved to set it aside and for a new trial, because,—

1. The verdict was against the weight of evidence and the instructions of the Court;—

2. The verdict for damages was excessive, and not authorized by any evidence in the case.

Demandant claimed the north half part of lot No. 62. The general issue was pleaded and joined, and, by leave of Court, upon terms, defendant, in a brief statement, disclaimed all that part of the north half of lot No. 62 which lies north of a line 24¼ rods south of the north line of 62.

The plaintiff claimed under a deed from the defendant, dated November 24th, 1840, of fifty acres of land in Cherryfield, bounded easterly by the Narraguagus river, northerly by Stephen O. Madden's lot, meaning to convey the north half of the McKay farm, (so called.)

Defendant offered to prove what land the parties directed Mr. Burbank to draw a deed of from Tucker to Madden. Objected to by plaintiff's counsel, and ruled inadmissible if different from that expressed in the deed. Defendant testified that the deed put into the case by him, from Gowen and George

W. McKay, was present at the time the deed to plaintiff was drawn, and was exhibited to Burbank to draw the deed from.

The following question was asked defendant by his counsel, viz.:— "Was Mr. Burbank directed to draw a deed of the north half of the land described in the said deed of McKay to him (Tucker)?" Objected to by plaintiff's counsel as inadmissible, (but not leading,) and ruled out by the presiding Judge.

There was evidence tending to show that lot No. 62 was the McKay farm, and so known and called for many years. There was also evidence tending to show that lot No. 62 and lot No. 80 were called and known as the McKay farm, and that the southerly half part of lots 62 and 80 were conveyed by the McKays to Freeman & Dinsmore, May 25, 1835, and by them to defendant. That the northerly half of 62 and 80 was afterwards conveyed to the defendant in March, 1836, and it was contended from this, and other circumstances, that the northerly half part of lots Nos. 62 and 80 must have been called and known as the McKay farm. And it was contended by the defendant, that the deed embraced the north half of the north half of lots Nos. 62 and 80.

The presiding Judge instructed the jury that the plaintiff was entitled by his deed to the north half of the McKay farm, as it was known and called at the time the deed was given, and not as the parties understood McKay's farm to be, unless it was so known and called.

The verdict was for demandant.

From the report of the evidence it appears that plaintiff read in evidence deed of Joseph Tucker to Rufus Madden, dated November 24, 1840 ; deed from Gowen W. McKay and George W. McKay to Wm. Freeman and Israel Dinsmore, May 25, 1835 ; deed William Freeman and Israel Dinsmore to Joseph Tucker, dated August 16, 1836, both deeds duly acknowledged and recorded. Plaintiff read the following depositions, viz.:— William Small, 2d, Nathaniel Strout, Wm. B. Nash, Freeman Kingsley, David Small and Isaac Patten, and then read the deed of Joseph Tuckerman and wife to

Gowen W. McKay, dated May 20, 1839, acknowledged and recorded, and rested his case.

Defendant read deed from Gowen W. McKay and George W. McKay to himself, dated March 29, 1836, acknowledged and recorded, and testified that James A. Campbell was employed to survey and run out the land sold by him to plaintiff. But it was first run out by Sabin P. Jordan, the same season plaintiff bought the land, after the deed, both himself and plaintiff present. Began at Stephen O. Madden's line and chained southerly, to get the width of the lot; chained $24\frac{1}{4}$ rods and put down stakes. The surveyor sighted east and stakes were put down along as far as plaintiff wanted to occupy. No stakes were placed on No. 80 at that time. Plaintiff assisted in the survey. Don't know whether plaintiff requested the survey or not. He claimed 50 acres out of the two lots 62 and 80. Sometime after this Madden appeared to be dissatisfied; said he ought to have more front. I told him he might get any surveyor he wished, to run it, and, if there was any mistake, I was willing to have it rectified. After this one of us, Madden or I, got James A. Campbell to run it. He chained across, chained down to the stakes where Jordan chained. He made the width the same as Jordan. Madden, at this time, drove two or three stakes on the line further west than any were placed before. He (surveyor) asked if we wanted to run it any further. Madden was satisfied at that time; appeared to be. There was no fence put up on this line. I lived on the part I bought of Freeman and Dinsmore. Madden occupied one side of that line, where stakes were, and I the other. He cut and hauled wood from lot No. 80, same as from No. 62. His occupancy has always been so, down to this time, of 80 as well as 62. The whole width of the whole lot 62, is 92 rods. He was entitled to 23. The whole width was supposed to be 97 rods; it was marked so on the plan. Plaintiff has always cut to those stakes, ever since he bought.

Defendant further testified, Madden went into possession the same season of the deed to him, and, soon after, built a

house on the land. I had a barn on the south part of the north half of lot 62, a new 40 feet barn, worth $200. Madden did not claim this barn. He came to me and wanted me to let him put his hay in it, and he would pay me for the use of it. And he did so for two years. The barn is about 20 rods south of the line between Madden and me.

*Cross-examined.* — I moved on to the premises, October 11, 1836. I moved into the old McKay house, the one William McKay built. I bought it in the spring; I cut the hay on it. Before that, I lived upon the place I sold to Charles Hall. I bargained with Freeman and Dinsmore and with the McKays about the same time, but did not get my deed of the McKays until the next year.

Defendant read the depositions of James A. Campbell, Alfred Tracy, Sybil Jackson, Caleb Tracy, Daniel McLaughlin, James A. Milliken, Levi C. Corthell, Joseph W. Foster, William Freeman, Caleb Burbank, and Joseph Adams.

Plaintiff resumed and read depositions of John Low, Daniel E. Nickels, Sabin P. Jordan, second deposition of same witness, and Jere O. Nickels' deposition.

*Rufus Madden,* (plaintiff,) sworn. Testified, prior to the purchase of Tucker, I had lived three or four years in Cherryfield. I had no acquaintance with the lots in the vicinity when I bought. My object in buying this land was to get hay. I was not present when the deeds were drawn up. They were read to me after I came there. It was in November I got the deed. Mr. Tucker showed where he said the line should be, before I took the deed. He told me it should be near the upper barn. It was very near the centre of the McKay farm of lot No. 62. I did not go into occupation that fall. I desired to have the line run before the deed was made. Mr. Tucker objected to it; said there was time enough to have that run at any time. I wanted it done then, because I was going away. I went into the woods logging. This conversation was before the deed was given. Tucker told me that it would cut 6 or 7 tons of hay on the upland, and one or two on the marsh. I gave for the land $550.

The next haying season, about July, I sent Daniel E. Nickels to cut the grass. He went and commenced. I told him there had been no line run. Tucker came and forbid him cutting where he was cutting. I went down and asked Tucker what he drove Nickels off for. He said he was cutting over the line. I said, did you not tell me the line came near the barn? (I was then near the barn.) He said no. I said he did, and I could prove it. He said I was crazy. It was on the north side of the barn he said the line would come, say, two rods north of the barn. He said, this farm is 200 acres, consequently, you will have to take a quarter. That was the first time any thing was said about the width of it. I told him, if I had known it, I would not have bought it at all, and that such a narrow piece of land was not fit to make a farm of, and complained that he had deceived me. Nothing more was said. He went off and got a surveyor. I say, he got the surveyor. They say, I got him. Sabin P. Jordan came there first with chain and compass. I was near there; do not recollect of taking any part in it, because I was opposed to it. I gave no orders. I did not stick up any stakes at that time. I gave no orders to Jordan; had nothing to say in the matter. Nickels went on and cut the hay and I made him a discount for the deficiency of the hay. I employed J. A. Campbell a year or two after for the sake of bringing a lawsuit to determine the difference there was in contention between me and Tucker. Neither of the surveyors had my deed. We did not do much. Esquire Freeman said, to make it legal, I had to give Tucker three days notice. It was on the river side of the road that Campbell surveyed. I could not tell how many stakes we put up; perhaps half a dozen. Where Nickels was cutting was outside of the stakes 15 to 20 rods. I have improved and cleared it some. He cut between one and two tons. I have cut the grass since 1840 to this date; average from two to three tons. I never took any means, for a long time, to have the line run. I employed a man to commence proceedings. I counseled with him to that effect. I remained on the premises 8 or 10 years

before I went to California.   I built a house on it two or
three years after I bought.   I was gone one and a half years
to California.   Very little on the 23 rods is cleared.   Four
years, next fall, since I undertook to assert a title to half of
the front lot.   In 1855 I claimed to the centre of the whole
lot.   I supposed, if there was 200 acres, and I was to have
50, it would be only a quarter of it, and I must take it the
whole length of the lot.   I carried my deed to a lawyer four
years ago next fall.

I was on a raft with Levi C. Corthell.   I did not have any
such conversation with him as he testifies to.   I told him my
case was then before referees, and that I knew nothing about
there being two lots of land.   I supposed that Bracey squat-
ted on the McKay farm; that he occupied a part of the Mc-
Kay farm.   I told him that I supposed there were 200 acres
of the McKay farm, and there were but 100 acres, and I was
going to try for the front lot.   I did not say that the deed
embraced land that was not intended to be conveyed.   I said
Tucker would have to give me what I bought.   I don't know
but I might have said Tucker was a little uneasy about it.   I
think there was an old log there, where Tucker said the line
would go.

*Cross-examined.* — I was to have 50 acres; nothing said
about McKay farm.   Tucker showed me where the 50 acres
would come.   Nothing was mentioned about the Bracey lot.
We didn't go back on the back lot.   Nothing was said about
a back lot.   The place he showed me, was to be the line of
the lot he sold me.   Nothing was said about the width of the
lot or of the width of what he sold, or of half.   I don't re-
member whether Campbell measured across or not.   I made
complaint to a good many about not getting land enough, and
that Tucker had wronged me.   I understood, that if the Mc-
Kay farm was the two lots, I had been cheated.   I under-
stood what I bought was about half the front lot.   Tucker
made objections to running the land out now, because I was
going away in the woods.   The dispute between us was about
15 or 20 rods width.   Have stated that my land would go 15

or 20 rods further. Never told any body that I was to have 25 rods width.

*Joseph Tucker*, recalled.—I never told Mr. Madden that the line would go near the barn. I had no such conversation with him as he has given. I showed him within a rod or two of where the line actually came. I told him I supposed it would go across a log and not far from a certain stump, and it did go within a rod of it.

*Cross-examined.*—I told him the whole lot, before the Mc-Kays sold any, was 200 acres. Lots 62 and 80 were called the McKay farm, before they sold the 100 acres to Freeman and Dinsmore.

*J. Granger*, with whom was *Freeman*, argued for the defendant:—

The presiding Judge erred in instructing the jury that the McKay farm must be taken to be what was so known and called, and not what the parties understood it to be. Evidence of what was the understanding of the parties, not inconsistent with the language of the deed, should have been admitted. *Hanson* v. *Russell*, 28 N. H. 117; *Hall* v. *Davis*, 36 N. H. 572.

The evidence discloses an ambiguity arising from the use of the words, " McKay farm, so called"; and it was not only proper, but absolutely necessary, to resort to parol evidence to determine what tract was intended. The parol evidence was intended to identify the subject on which the deed was to operate. *Waterman* v. *Johnson*, 13 Pick. 261; *Stone* v. *Clark*, 1 Met. 380; *Emery* v. *Webster*, 42 Maine, 204.

They argued, also, that the verdict was against the weight of evidence.

*Geo. F. Talbot*, argued for plaintiff:—

The answers of Burbank were objectionable, because they do not meet the true issue, *what was conveyed by the deed?* What the parties intended, was not the question. A grantor cannot limit the effect of his deed by his own testimony.

*Gray & ux.* v. *Hutchinson,* 36 Maine, 142; *Osgood* v. *Davis,* 18 Maine, 146.

The case does not come within the rule that parol evidence is admissible to identify the subject matter upon which a deed operates, as in *Waterman* v. *Johnson,* 13 Pick. 261. What the McKay farm was, evidence ought to be, and was admitted to show. The defendant wanted to show what the parties understood it to be.

Nor is the defendant's case within the rule allowing parol evidence of the construction given by the parties themselves, as proved by the manner in which they exercised their respective rights under the deed, to explain ambiguous words not explainable by the context. *Choate* v. *Burnham,* 7 Pick. 276; 3 Dane, p. 363, § 16.

Mr. Talbot, in order to show the true limit and purpose of parol testimony in reference to deeds, cited also *Comstock* v. *Vandenson,* 5 Pick. 163; *Linscott* v. *Fernald,* 5 Maine, 496; *Elder* v. *Elder,* 10 Maine, 80; *Osgood* v. *Davis,* 18 Maine, 146; *Pride* v. *Lunt,* 19 Maine, 115; *Lowell* v. *Robinson,* 16 Maine, 357; *Farley* v. *Bryant,* 32 Maine, 474; *Jordan* v. *Otis,* 38 Maine, 429; *Rogers* v. *McPheters,* 40 Maine, 114; *Wellington* v. *Murdough,* 41 Maine, 281.

He also argued against the motion for a new trial upon the evidence.

The opinion of the Court was delivered by

CUTTING, J.— On November 24, 1840, Tucker conveyed to Madden, "a certain lot, piece or parcel of land situate in said Cherryfield, and containing fifty acres, and bounded on the east by the Narraguagus river, and on the north by the farm on which Stephen O. Madden now lives. The land which is hereby conveyed is the north part of the McKay farm, (so called.)"

It appears that, at the time of the conveyance, Tucker was the owner of two lots; viz., a front lot, No. 62, bounded on the east by the Narraguagus river, and another lot, No. 80, in

the rear of the front lot, and originally occupied by one Bracey; each containing one hundred acres, and both bounded on the north by the farm of Stephen O. Madden, (according to the testimony of Daniel McLaughlin,) claiming title to the north half of the two lots by a deed from Gowen W. and George W. McKay, dated March 29, 1836, and to the south half of the same lots, by deed from Israel Dinsmore and William Freeman, bearing date August 16, 1836, who claimed under a deed from the McKays.

At the trial, a question arose as to what constituted " the McKay farm, (so called,)" on November 24, 1840. It was contended by Tucker that it embraced the north half of both lots, and by Madden that it was the whole of the front lot. The verdict has settled that issue in favor of the latter, which, on examining the evidence under the motion, we see no cause to disturb, unless the ruling of the presiding Judge in excluding certain evidence offered in defence, was erroneous.

The deed from the McKays to Dinsmore and Freeman, of May 30, 1835, after describing certain exterior lines of the south half of the two lots, contains this language, " meaning and intending to convey the south half of all the farm whereon we now live, *together* with one half of the Bracey lot, so called."

The deed from the above grantees to Tucker, (this defendant,) of August 16, 1836, conveys one hundred acres, " being the same tract or parcel of land which we purchased of Gowen W. McKay and Geo. W. McKay, as their deed to us, *now on record, will more particularly show.*" Both deeds were witnessed by, and acknowledged before, Caleb Burbank, Esq. When Tucker took this deed, it may be presumed that he knew the record title to which therein he was referred; and it was the south half of all the farm on which we (the McKays) now live, together with (or in addition thereto) one half of the Bracey lot, so called, — " together" being a term of exclusion and not inclusion, in reference to the farm.

The case finds that, when the deed of the north half, from the McKays to Tucker, of March 29, 1836, before referred to,

had been introduced by the defendant and proved to have been shown to Mr. Burbank when he wrote the deed from Tucker to Madden,·" the following question was asked defendant by his counsel, viz.: — Was Mr. Burbank directed to draw a deed of the north half of the land described in the said deed?" which, *together* with a similar question before asked, as to what the parties directed him to do, were ruled inadmissible.

It needs no labored argument or citation of authorities to establish the correctness of the rule of law which excluded such testimony; otherwise, titles by deed, however solemnly executed, would become as evanescent as human memory, and landmarks become only idealities.

*Again,* exception is taken, because the Judge instructed the jury, " that the plaintiff was entitled, by his deed, to the north half of the McKay farm, as it was known and called at the time the deed was given, and not as the parties understood McKay farm to be, unless it was so known and called."

This instruction was substantially the language of the deed, especially its concluding and most important part of the description; for the former part bounded the grant on the east by the Narraguagus river, and on the north by the S. O. Madden lot, which description alone would answer equally as well the hypothesis of either party as to those boundaries. We must then discover the intention of the parties in the concluding part, which, by the term "farm" gives such a certain description as will determine the extent of the lot conveyed. *Abbott* v. *Pike*, 33 Maine, 204; *Chesley* v. *Holmes*, 40 Maine, 536. Taking, therefore, the whole description together, there is no ambiguity in the deed,— the grantor conveyed the north half of the McKay farm, so called; and what were the boundaries of the "McKay farm, so called," was a question of fact for the jury, as in all cases of boundaries. The ambiguity is wholly in the conflict of the testimony as to the boundaries; or, in other words, whether both or only one of the lots was called the McKay farm, there being no controversy as to the exterior lines of either lot. The legal

interpretation of the term "so called," is not what I or we say, but what the public generally say, and such was virtually the language of the grantor in his deed, and what the jury were instructed to find. It is not the duty of courts to unsettle all record titles to real estate, by violating rules of law, because some unskillful, ignorant or misinformed scrivener may not have obeyed, in every particular, his instructions.

As to the case of *Webster* v. *Emery*, 42 Maine, 204, cited and relied upon by defendant's counsel, if it means that a monument, answering in all particulars the call in the deed, is to be removed by parol testimony, and another monument, dissimilar, erected in a different place, then it cannot be law. But, if it means that, where there are two monuments, either of which may answer the call, it becomes a question of fact for the jury, it is law and in harmony with the instructions of the presiding Judge in this case.

*Exceptions and motion overruled.*

*Judgment on the verdict.*

TENNEY, C. J., and RICE, APPLETON, MAY, and KENT, J. J., concurred.